UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

KELLY BEATTIE,

        Plaintiff,

vs.

CITY OF KENNEWICK,

        Defendant.

No.: 4:16-CV-05130-LRS

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

**BEFORE THE COURT** is Defendant City of Kennewick's Motion For Summary Judgment (ECF No. 27). The motion was heard with telephonic oral argument on October 10, 2017. William Edelblute, Esq., argued for Plaintiff. Shannon E. Phillips, Esq., argued for Defendant.

## I. BACKGROUND

This is a lawsuit brought by Kelly Beattie, a former employee of the City of Kennewick. Plaintiff alleges she was subjected to a sexually hostile work environment and to disparate treatment on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*. Plaintiff also alleges age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §623, and the Washington Law Against Discrimination (WLAD), RCW 49.60.

//

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT-  1**

## II. UNDISPUTED FACTS

Plaintiff was hired by the City of Kennewick as a Maintenance & Construction Craftsworker in the Water Division of the Public Works Department, starting January 2, 2015.

Plaintiff was a probationary employee for one year and was subject to termination by the City at any time, without or without cause, and without right of appeal.

The essential duties of her position included: replacing, repairing and installing water lines, including through use of equipment such as saws, jackhammers, and trucks; repairing broken water mains; cutting and replacing pipes; cutting asphalt street sections with a concrete saw; installing and repairing water meters; installing and maintaining valves; and conducting water pressure tests.

Plaintiff was required to obtain a Class A Commercial Driver's License within 12 months of her being hired, and a Water Distribution Manager Level I certification within 18 months.

Plaintiff's crew leader was Rick Ralston initially, and then beginning in March 2015, it was Charles Arntz. The Water Service Supervisor was Joshua Pantzke.

Pantzke developed concerns about Plaintiff's performance. He discussed those with Plaintiff in late March 2015, and summarized those concerns and his discussion with Plaintiff in an email dated March 27, 2015. Pantzke expressed concerns about Plaintiff being late in reporting to leave for a jobsite, being distracted by her cell phone while on the job, not being attentive in learning about a repair, and creating "busy work" rather than focusing on the task at hand. Pantzke requested that Plaintiff refrain from using her cell phone other than during break times. Plaintiff acknowledged she was late in reporting to leave for a jobsite.

On April 22, 2015, Plaintiff had a "near miss" with a cut-off saw. Plaintiff pulled the saw cord too hard, causing her hand to slip. Pantzke investigated the incident and Plaintiff explained to him that she was unfamiliar with the saw.

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-     2**

Pantzke instructed Arntz to continue to work closely with Plaintiff to provide all necessary training and to monitor her progress. Arntz tested Plaintiff on a meter set installation on May 5, 2015. Despite Arntz's repeated indications during the test that it was meant to measure her skills so he could determine where she might need additional training, Plaintiff kept asking him questions. According to Arntz, Plaintiff was "all over the place" while she was getting the parts ready, did not really know how to bend the tail piece, and told Arntz she was "very unsure of herself." It took nearly three hours to install the meter set.

On April 30 and May 8, 2015, Arntz met with Plaintiff about work production and time management. He explained that Plaintiff was spending too much time trying to troubleshoot the computer, and should be focused on learning maintenance skills and completing assigned tasks.

On May 19, 2015, Arntz met with Plaintiff about concern the Plaintiff was disappearing throughout the day such that her co-workers had to look for her and often could not find her. He explained that co-workers who were waiting for her would often find her in different City departments talking with other employees.

As part of the meeting on May 19, 2015, Arntz discussed with Plaintiff concerns about her level of comfort with the GPS unit which is used by Water Division employees to update water meter locations in the City's geographic information system. Plaintiff indicated that new things were difficult for her, her memory was not good, and that she would try harder to figure things out.

Pantzke presented Plaintiff with a draft proficiency work plan on June 9, 2015. As explained in the plan, and acknowledged by Plaintiff, despite Plaintiff being trained on key tasks, the Water Division was "not seeing the type of proficiency or improvement in skill set needed to meet the needs of our department." The plan identified tasks in which Plaintiff needed to develop proficiency over the next 30 days.

///

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-     3**

Pantzke and Plaintiff agreed, however, to postpone implementation of the proficiency work plan while Plaintiff applied for a job vacancy in the Meter Reading Division which is part of the City's Finance Department. Pantzke explained that he would loan Plaintiff to the Meter Reading Division so she could gain experience there.

During June and July 2015, Plaintiff was loaned to the Meter Reading Division on occasion to help with its needs. While on loan to the Meter Reading Division, Plaintiff assisted primarily with delinquent accounts, which involved visiting pre-identified properties, taking updated readings, posting delinquency notices, and turning off water service when necessary.

On June 22, 2015, Plaintiff formally applied to transfer to the vacant Maintenance & Construction Craftsworker position in the Meter Reading Division. Ultimately, Plaintiff was not selected for the full-time vacancy in the Meter Reading Division. She was informed of this decision on or about July 23, 2015. Instead, Aaron Britain, the 22 year old son of a City councilperson, was selected for the position.

On or around July 9, Bill Hansford (Plaintiff's co-worker, friend and union steward), contacted the City's Human Resources Director, Corey Osborn, to express concerns relating to Plaintiff's attitude. Hansford explained that Plaintiff was becoming very negative about her own capabilities and her ability to successfully perform her work assignments. Hansford suggested this shift in attitude was due to Plaintiff being called into meetings to discuss her performance and he thought Osborn should meet with Plaintiff to reassure her about the City's commitment to her success. Osborn expressed reluctance to call Plaintiff into another meeting and suggested it would be better if Plaintiff requested a meeting. The following day, Plaintiff sent Osborn an email indicating she had been advised to try and meet with Osborn.

///

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT-    4**

Shortly after July 23, Plaintiff met with Pantzke, Arntz and Osborn to discuss and implement a revised version of the proficiency work plan that had been previously discussed on June 9.

On July 24, Pantzke, Arntz and Plaintiff signed the revised proficiency work plan. According to the plan, "[b]eginning July 24, we will evaluate you over the next 30 working days to determine if you are showing . . . proficiency improvement . . . and on or after August 24, we will reconvene to discuss your progress and path forward."

On July 30, Osborn met with Plaintiff and Hansford. Plaintiff admitted her attitude had deteriorated over time, explaining she felt poorly about having been called into so many meetings with her supervisors and administration. Osborn explained that the meetings were a sign of the City's commitment to helping her succeed, but that she needed to improve her attitude. The next day, following this meeting, Plaintiff wrote Osborn to thank him for his help.

On August 11, Arntz again tested Plaintiff on a meter set installation. He documented several errors in Plaintiff's work and concluded that she "improve[d] from the last time I tested her, but she needs a lot of work on time management . . . execution. I still would not send her out . . . by herself on this task."

On August 18, Arntz tested the Plaintiff on valve turning. In notes regarding the test, he explained that Plaintiff did certain tasks well, but expressed concern that Plaintiff claimed to be unfamiliar with the GPS unit used to get to the work site, parked the truck incorrectly upon arrival, and failed to identify why the equipment needed for the work was not properly functioning.

During August 2015, Pantzke and Arntz received complaints from Water Division employees about what they perceived to be Plaintiff's negative attitude. Pantzke documented the complaints received from Steve Mitchell and Bryson Hamby.

///

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT-    5**

On September 9, 2015, Osborn held a meeting with Plaintiff and chief union steward, Steve Golladay. Osborn provided Plaintiff with a termination letter and informed her that her employment was being terminated immediately.

Immediately following the meeting, Osborn overheard Plaintiff shouting in the building lobby "something to the effect of 'no one likes working with me' and 'apparently I'm terrible at my job.'" Osborn told Plaintiff this was an example of the negativity she was demonstrating in her work and that she needed to collect her things and leave the building.

## III. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975). Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact-finder could find in favor of the non-moving party. *Id*.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a

///

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT-    6**

genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

When considering a motion for summary judgment, the court does not weigh the evidence or assess credibility; instead "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-23.

According to the Ninth Circuit, motions for summary judgment in an employment discrimination case must be carefully examined in order to zealously guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). An employee need only produce "very little evidence" to survive summary judgment in a discrimination case because the ultimate question is one that can only be resolved through a "searching inquiry," one that is most appropriately conducted by the factfinder upon a full record. *Schnidrig v. Columbia Mach, Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).

**IV. HOSTILE WORK ENVIRONMENT IN WATER DIVISION**

To succeed on a Title VII hostile work environment based on sex, Plaintiff must prove she was subjected to verbal or physical conduct of a sexual nature, that the conduct was unwelcome, and that the conduct was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive work environment. *Rene v. MGM Grand Hotel, Inc.* 305 F.3d 1061, 1065 (9th Cir. 2002)(en banc). The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-    7**

fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275 (1998). Whether the conduct is severe or pervasive is determined by reference to the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000). The required showing of severity of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991). The offensive conduct need not, however, be both severe and pervasive. It need be only severe or pervasive. A "general hostility to the presence of women in the workplace" is enough. *Kortan*, 217 F.3d at 1110.

Defendant contends the conduct alleged by Plaintiff is not of a sexual nature and even assuming it is, it was not "sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive work environment."

Plaintiff was the only female crew member in the Water Division under Arntz's supervision. (ECF No. 31-8 at p. 26).[1] Plaintiff says Arntz asked the City for terms,

---

[1] An employee is a "supervisor" for purposes of vicarious liability under Title VII only if he is empowered by the employer to take tangible employment actions against the victim (e.g. hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits). *Vance v. Ball State University*, ___ U.S. ___, 133 S.Ct. 2434, 2443 (2013). This is not an issue here, at least on summary judgment, as both Arntz and/or Pantzke appear to be "supervisors" empowered by the City to take tangible employment actions against fellow employees. An employer is liable for discrimination/harassment by co-workers, including supervisors who are not empowered to take tangible employment actions against fellow employees, only if the employer was negligent in controlling working conditions. *Id*. at 2441.

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-    8**

conditions and privileges for "my guys," thereby excluding Plaintiff from his request, based on her gender. Plaintiff says she was subject to remarks which she contends were based on her gender such as Arntz stating that she must not want to get her boots wet; that issues were made of her smoking and use of a cell phone on the job, while male crew members were not questioned for the same actions (Plaintiff's Dep., Ex. B to ECF No. 28 at p. 163-66);. and that Pantzke once asked her if she had the mental capacity to do something relating to computers. (Plaintiff's Dep. at pp. 180-81). Plaintiff acknowledges she never told her supervisors about a male crew member's use of a cell phone and had no reason to believe they would have known about it. (Plaintiff's Dep. at p. 167).

Plaintiff says she was ignored by Arntz during morning meetings, an example being on one occasion when Arntz commented on the hi-visibility coat being worn by a male crew member, but did not acknowledge that Plaintiff was also wearing such a coat. (Plaintiff's Declaration, ECF No. 31-13 at Paragraph 10). There apparently was discussion about it not being cold enough to wear the coats and the male crew member and Plaintiff were the only two wearing the coats that particular morning. (Plaintiff's Dep. at pp. 176-77).

Plaintiff says Arntz once asked all of the male crew members whether they had signed up for the water certification class (a requirement of the job), but did not ask her whether she had signed up. Plaintiff had already signed up for the class, but she did not inform Arntz of that. (Plaintiff's Declaration at Paragraph 9).

Plaintiff contends she was not provided the same on-the-job assistance as male crew members, for example, with regard to computer training. Plaintiff says she was aware the male crew members had a "cheat sheet" to help them with the computer, but Arntz did not provide her with that even though he knew she was having trouble with the computer. Plaintiff says she learned of the existence of the "cheat sheet" after some new employees were hired and the "cheat sheet" was then emailed to everyone, but claims that was long after she "asked for help with the computer and

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-     9**

by then [she] had already figured it out."  (Plaintiff's Declaration at Paragraph 11). Arntz claims the "cheat sheet" was created several years earlier when he was a craftsworker in the Water Division and that when he returned there as a crew leader in March 2015, he distributed the "cheat sheet" to all the employees in that division, including Plaintiff.  (Arntz Declaration, Ex. C to ECF No. 28, Paragraph 13).

Plaintiff says she told Pantzke she was having trouble with the computer program and he said for Plaintiff to "come in early" for help from "somebody," with no further direction as to what that meant or who would help her.  According to Plaintiff, no overtime was authorized for her to come in prior to her usual starting time of 7 a.m..  (Plaintiff's Declaration at Paragraph 12).  Arntz claims Plaintiff misunderstood that the direction was for her to come in early from the field at the end of the day to get help and that she never sought clarification as to when to come in. (Arntz Dep., Ex. B to ECF No. 28 at p. 205).  In deposition testimony, Plaintiff suggests she did on at least one occasion come in early from the field to get help with the computer.  (Plaintiff's Dep., Ex. B to ECF No. 28 at pp. 127-28).

Plaintiff says that she got to go with Bill Hansford, the "locator," only twice to learn about "locating," whereas another crew member, George Messenger, who started working the same time she did, received multiple opportunities over a period of weeks to learn locating.  Furthermore, crew member Tim Harris, who had been there less time than Plaintiff, was assigned to be the backup "locator."  (Plaintiff's Declaration at Paragraph 20). "Locating" involves locating underground utilities with an electronic device and then marking them, usually for contractors and/or homeowners who are going to be digging in the ground. According to Arntz, Plaintiff was not assigned to learn more advanced "locating" duties because she was struggling with her regular duties, and because Hansford expressed concern that Plaintiff would not be a good fit for "locating" because she could not figure out the computer or the electronic system.  (Arntz Declaration at Paragraph 20).

///

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-    10**

Plaintiff says that on April 30 and May 8, Arntz told her she needed to learn the maintenance portion of her duties first and that the computer work would come in time. (Plaintiff's Dep., Ex. B to ECF No. 28 at pp. 124-27). The City asserts it is "clear from the context" that the computer work referred to by Arntz was related to Plaintiffs' regular duties as distinct from the computer work involved in "locating." The City also maintains that the concern attributed to Hansford is not hearsay because it is not offered for the truth of the matter asserted, but to show its effect upon Arntz in not assigning more advanced "locating" duties to the Plaintiff. Fed. R. Evid. 801(c).[2]

In her declaration, Plaintiff indicates that when she observed an all male crew using a "cut-off" saw, the members would trade off in making the cuts in a four cut square: a first cut would be made by one member, the next cut would be made by another member, and they would alternate in this fashion. Plaintiff says that when she used the cut off saw, the worker she was with did not assist her, leaving her to make all four cuts. (ECF No. 31-13 at Paragraphs 17-18). Plaintiff does not indicate whether there was in fact some kind of established protocol regarding this, nor does she indicate she complained to her supervisors about this.

Plaintiff says she was not included on a call-out list for working on after-hours problems. (Ex. C to ECF No. 31-13). The City offers no explanation why Plaintiff was not on the list, but there is also no indication that Plaintiff ever complained to anyone about not being on the list.

The court is obliged to look at all of the relevant circumstances in determining if there is a genuine issue of material fact whether a work environment was hostile. *Kortan*, 217 F.3d at 1111. While some of the aforementioned circumstances appear innocuous on the surface (e.g. Arntz's references to "my guys;" telling the Plaintiff to get her boots wet; not acknowledging that Plaintiff was wearing a hi-visibility

---

[2] The court defers final ruling on Plaintiff's evidentiary objection.

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT-    11**

coat), the totality of the circumstances show incidents that collectively could have altered Plaintiff's conditions of employment because of her gender. The City invites the court on summary judgment to weigh the evidence, assess the Plaintiff's credibility versus the credibility of Arntz and Pantzke, and determine as a matter of law what Arntz and Pantzke intended by their actions and comments. This the court cannot do. A justifiable inference arises from all of the evidence that Plaintiff was subjected to a hostile work environment because of her gender.

This is especially so considering that while the City maintained there were continuing problems with Plaintiff's technical ability to discharge her job duties, the September 9, 2015 termination letter from Osborn suggested otherwise. The letter informed Plaintiff that "[a]lthough your work plan has not yet been completed, **you have to date satisfactorily demonstrated the required technical skills and abilities**." (ECF No. 28, Ex. 7 to Ex. A at p. 57). (Emphasis added). Instead, the letter indicated Plaintiff was being terminated for her "attitude:"

> [T]he City has spoken to you about your attitude and the need for you to maintain a positive attitude in the workplace on multiple occasions. Most recently, you and I spoke, along with Bill Hansford, about the need for you to maintain a consistently positive attitude. You and I specifically discussed that the City was unlikely to continue your probationary employment if you did not maintain a positive attitude **regardless of your technical proficiency**.
>
> Unfortunately, the City has continued to receive feedback that you demonstrate a negative attitude around your co-workers and that you have continued to make derogatory remarks concerning the City. At least two of your fellow crew members have asked to be reassigned to other tasks as a direct result of your negativity.

(*Id.*) (Emphasis added).

A negative attitude may constitute a legitimate, non-discriminatory reason to terminate employment, but Plaintiff asserts that if there was an issue with her attitude, it was the result of gender-related harassment and not getting the meter reader position due to what she alleges was gender and/or age discrimination (see discussion *infra*). This assertion cannot be dismissed out of hand.

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-    12**

As discussed above, the Ninth Circuit had cautioned district courts about granting summary judgment in employment discrimination cases. This case requires a full airing of the evidence and an opportunity for the court, as the fact finder, to evaluate the credibility of the witnesses.[3] The Plaintiff has produced enough evidence to survive summary judgment.

## V. GENDER AND AGE DISCRIMINATION (DISPARATE TREATMENT) RE HIRING FOR WATER METER READER POSITION

In order to prevail on a Title VII claim of gender discrimination or on an ADEA/WLAD claim of age discrimination, Plaintiff must first establish a *prima facie* case consisting of the following elements: 1) she belongs to a protected class; 2) she was performing her job according to the employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) other employees with qualifications similar to her own were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). Specifically with regard to age discrimination, Plaintiff must show she was within the statutorily protected age group (40 years of age or older) and a significantly younger person was hired instead of her. *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008); *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 188, 23 P.3d 440 (2001).[4]

For purposes of its summary judgment motion, the City concedes Plaintiff may be able to establish a *prima facie* case of discrimination in connection with her not being hired for the Meter Reader position "as she is a woman over age 50 (51 when not hired), she was considered for the position, she was not selected, and a male in

---

[3] There has been no jury demand and this matter is set for a bench trial.

[4] RCW 49.60.180(2) makes it unlawful for employers to discharge or bar any person from employment because of age. The statutorily protected age group includes those 40 years of age or older. RCW 49.44.090.

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT-    13**

his twenties was ultimately hired for the [position]." The City contends, however, that it had legitimate non-discriminatory reasons to not hire Plaintiff for the position and Plaintiff has no evidence to show the City's reasons were a pretext for discrimination.

If the Plaintiff establishes a *prima facie* case, the burden then shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *McDonnell*, 411 U.S. at 802. Once the Defendant satisfies this burden, the Plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is pretext for a discriminatory motive. *Id*. at 804.

The burden of proving pretextual discriminatory motive can be met by demonstrating the employer's proffered explanation for its adverse employment decision is inconsistent or otherwise unbelievable. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005). The Plaintiff may offer direct or circumstantial evidence of discriminatory animus. *Id*. at 1038. Direct evidence is evidence that proves discriminatory animus without the need for inference or presumption. *Id*. Such evidence typically consists of overtly discriminatory comments or actions by the employer and creates a triable issue for the finder of fact, even if the evidence is insubstantial. *Id*. Circumstantial evidence, which relies upon inferences and presumption, must be both specific and substantial in order to withstand summary judgment. *Id*.

According to the City, it chose not to hire Plaintiff for the Meter Reading vacancy because she performed poorly while on loan to the Meter Reading Division. In her declaration, Shannon Frame, the Customer Service Manager for the Meter Reading Division, says the Water Division loaned Plaintiff to the Meter Reading Division on occasion during June and July 2015, and that "[i]n this role, [Plaintiff] had difficulty reading and understanding non-payment reports, skipped properties when she was out in the field, sometimes posted delinquency notices on the wrong properties and sometimes failed to actually shut off service when assigned to do so."

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-  14**

(Frame Decl., Ex. E to ECF No. 28, at Paragraph 4; Frame Dep., ECF No. 31-7, at p. 9). In support of her assertion, Frame has produced a single email documenting a single instance in which Plaintiff failed to turn a meter off at a residence. (Ex. 1 to Frame Decl.). And this July 9 email to Arntz and Pantzke asks for Plaintiff's assistance in hanging notices at seven other residences. Although Plaintiff had purportedly made multiple mistakes by this time (Frame Dep. at p. 15), Frame continued to ask for Plaintiff's assistance. Plaintiff says the one mistake referenced in Frame's email is the only one she recalls being brought to her attention while she was on loan to the Meter Reading Division. (ECF No. 31-13 at Paragraph 21). None of the emails Frame exchanged with the Water Division prior to July 9 or thereafter expressed any reservation about asking for Plaintiff's assistance. (ECF No. 31-10).[5] Plaintiff says she was told by Mr. Osborn that she was not getting the meter reader position because of her "poor attitude" and he did not mention anything about performance problems. (ECF No. 31-13 at Paragraph 24).

This evidence gives rise to a genuine issue of material fact whether the City articulated a legitimate non-discriminatory reason for not hiring the Plaintiff for the full-time meter reader position. Even assuming the City articulated such a reason, there is a genuine issue of material fact whether the stated reason is pretextual in that the City contends Plaintiff committed numerous errors while on loan as a meter reader, yet the record developed during that time gives rise to a justifiable inference that there were not numerous errors committed by Plaintiff. The City's motion effectively asks the court to find Frame is more credible than the Plaintiff who

---

[5] In his declaration, Pantzke states that it was his intention that managers in the Meter Reading Division would assess Plaintiff's skills (Ex. D to ECF No. 28 at Paragraph 8), but Frame testified at her deposition that it was not her role to evaluate Plaintiff's performance and she did not evaluate Plaintiff's performance. (ECF No. 31-7 at p. 10).

**ORDER DENYING MOTION**
**FOR SUMMARY JUDGMENT-    15**

contends she can recall making only one mistake. Credibility issues cannot be resolved on summary judgment. As the trier of fact in this case, the court will decide who is more credible after seeing and hearing Frame and the Plaintiff in person.[6]

## VI. TERMINATION OF JOB WITH WATER DIVISION DUE TO GENDER DISCRIMINATION (DISPARATE TREATMENT)

Defendant asserts Plaintiff cannot meet the *prima facie* case with regard to this claim because she cannot establish that other employees with qualifications similar to her own were treated more favorably. According to Defendant, Plaintiff cannot establish that any probationary employees outside of her protected class were similarly situated "in that they likewise had skill deficiencies and attitude problems, yet they were retained, while [Plaintiff] was not."

As discussed above, the termination letter from Mr. Osborn indicates Plaintiff was not terminated for "skill deficiencies." Furthermore, Plaintiff asserts that if she had "attitude problems," it was the result of gender-related harassment and not getting the meter reader position. There is a genuine issue of material fact whether Plaintiff was subject to gender-related harassment and this court, as the trier of fact, will decide that question based on a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses. If the City terminated Plaintiff for a negative

///
///
///

---

[6] It is also for the court, as the trier of fact, to determine whether to give credence to the City's assertion that Plaintiff was eliminated as a candidate for the job before Mr. Britain was considered for the job, such that Plaintiff and Mr. Britain were not competing for the same job.

**ORDER DENYING MOTION
FOR SUMMARY JUDGMENT-     16**

attitude which was the result of gender-related harassment and/or gender and/or age discrimination, that would constitute a pretextual reason for terminating the Plaintiff.[7]

## VII. CONCLUSION

For the reasons set forth herein, Defendant's Motion For Summary Judgment (ECF No. 27) is **DENIED**.

**IT IS SO ORDERED**. The District Executive is directed to enter this order and forward copies to counsel.

**DATED** this   16th   of October, 2017.

*s/Lonny R. Suko*
―――――――――――――――――
LONNY R. SUKO
Senior United States District Judge

---

[7] As Defendant points out, while Plaintiff was employed by the City, she never complained to anybody that she was being discriminated against on the basis of gender and/or age. While that is a relevant fact that should be considered by the fact finder, it is not dispositive of whether there was discrimination.

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT-    17**